## MABEL BARDEN v. ARCHER DANIELS MIDLAND COMPANY.[1]

January 6, 1933.

No. 29,246.

*Snyder, Gale & Richards,* for relator.
*G. W. Mantor,* for respondent.

HILTON, J.

Certiorari to review a decision of the industrial commission awarding compensation to the widow and minor children of a deceased employe, Sherman Barden.

Barden had been employed by relator off and on for 14 years in one of its linseed oil mills in Minneapolis. The work therein involved the cooking of linseed, extracting the oil therefrom, and making linseed meal cakes as a by-product. Barden's work was on the ground floor of the mill, where upwards of 20 men were usually employed. He operated a "former" or press machine, which pressed the oil out of the linseed and left meal cakes weighing from 12 to 13 pounds. These cakes were then taken out of the

[1]Reported in 246 N. W. 254.

"former" and loaded on small trucks which were pushed by hand to a trimmer table, where the cakes were "stripped."

There was in use in the workroom a compressed air hose having a four and one-half foot metal pipe nozzle with an opening therein one-fourth inch in diameter. It was used to blow sediment from the presses, thereby giving the oil a chance to run out more freely. It was also occasionally used for blowing meal dust from the heaters. The pressure of the air in the nozzle was from 80 to 85 pounds. On October 20, 1931, at a little after two o'clock p. m. deceased came in contact with this nozzle in the manner hereinafter described, with the result that his colon was ruptured, causing a general infection and inflammation of the peritoneal cavity, from which he died in a hospital at 11:10 a. m. the following day.

One Hartley was and for a long time had been relator's foreman in charge of the large room in which deceased and other workmen were employed. He had the right to and did hire and discharge at pleasure any of the workmen. He directed and controlled the work. Hartley was given to fooling with the men in an unseemly manner. Frequently he would take hot meal and insert it in the back part of employes' overalls.

It was the custom, in addition to the noon intermission, to have a ten-minute rest period just prior to two o'clock p. m. During that intermission on the afternoon in question considerable fooling and joking as well as horseplay was indulged in. Such happenings were not uncommon in that room; they were of quite frequent occurrence. It appears that in the main such foolishness was made "in good fun," accompanied with laughter. During that short rest period Hartley was picking on deceased, making fun of him. He took off Barden's cap and threw it on the floor; he referred in a teasing manner to his large shoes and the quantity of food he ate.

As the rest period was ending and Barden was going to resume his work, Hartley shoved a "scraper" toward him. It stopped within about two feet of Barden, who shoved it back toward Hartley. Barden then started his work, took the meal cakes out of the "former," loaded 22 of them on a truck, and pushed it to the trim-

mer table. As he was placing the cakes upon the table Hartley picked up some meal from the floor and threw it on Barden. The latter picked up some meal and threw it back at Hartley. After finishing unloading the cakes Barden started pulling the truck back toward his "former," where he was to secure another load of cakes. In doing so he walked backward, with his hands on the truck, the top of which was about two feet from the floor. Barden was a large man, and necessarily when pulling the empty truck assumed an extreme stooped position with his buttocks far extended. As he was so pulling it away from the table, Hartley, who was back of him, grabbed the air hose nozzle from another employe (a "slusher") and at a distance of from three to four feet turned the hose air on Barden, beginning with his neck and going down his back to his legs and then "come close and put it right in his rectum." The highly compressed air from the nozzle entered the interior of Barden's body, causing the fatal injury.

The evidence shows that on a previous occasion—within a year— Hartley had done the same thing with the nozzle to another employe, however without doing any damage. There was some evidence that complaints had been made to relator's general foreman and to its superintendent relative to the manner in which Hartley generally conducted himself in skylarking and horseplay with the men.

It is not questioned that at the time of the fatal injury Barden was in the course of relator's employment. The only question presented is whether the accident arose out of such employment. The commission's finding that it did so arise was proper.

It is the general rule that no compensation is recoverable under the workmen's compensation acts for injuries sustained through horseplay or fooling which was done independently of or disconnected from the performance of any duty of the employment, since such injuries do not arise out of the employment within the meaning of the acts. However, the right to compensation has been recognized in many instances where an employe has sustained injury through horseplay instigated by others and the injured workman

had no part in it. Also compensation has been allowed in cases where the skylarking or horseplay was commonly carried on with knowledge or consent of the employer, or at least with the employer's acquiescence. See generally 13 A. L. R. 522, et seq; Harper, Workmen's Compensation (2 ed.) p. 100, § 48; also State ex rel. Johnson S. & D. Co. v. District Court, 140 Minn. 75, 167 N. W. 283, L. R. A. 1918E, 502; Leonbruno v. Champlain Silk Mills, 229 N. Y. 470, 128 N. E. 711, 13 A. L. R. 522; Socha v. Cudahy Packing Co. 105 Neb. 691, 181 N. W. 706, 13 A. L. R. 513.

When the fatal accident occurred Barden was doing his allotted work in a proper manner, without any knowledge as to what Hartley was about to do; he had nothing to do with the air hose. In all the pranks mentioned, Hartley was the instigator and aggressor. Barden did not "start anything" himself. In carrying on the horseplay Hartley evidently was devoting his entire attention to Barden. The evidence warranted the commission in concluding that at the time of the fatal injury deceased was not himself engaged in any horseplay or fooling. The evidence also reasonably sustained a conclusion that the employer knew or should have known of the common practice of its foreman and employes. The accident can well be said to have been the natural result of the horseplay proclivities of relator's foreman. Barden was exposed by his employment to the risks therefrom. The causal connection between the injury of the deceased and the conditions under which he was required to work placed the liability upon the employer. Strange to relate, there have been quite a number of such air hose cases, although not in this state. In some, award of compensation has been sustained, and in others not. The cases as a rule have turned on the facts in each.

Wherever the facts are at all in dispute the ascertainment of the truth therefrom was for the commission. Under the familiar rule laid down in Jones v. Excelsior Laundry Co. 183 Minn. 531, 237 N. W. 419, the findings of the commission here should not be disturbed.

Affirmed.